IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MARQUISE ATKINS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-cv-00727-AGF |
| | ) | |
| LARRY DENNEY, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the pro se petition of Missouri state prisoner Marquise Atkins for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was charged with murder in the first degree, robbery in the first degree, and two associated counts of armed criminal action. Following a trial held in December 2009, the jury found Petitioner guilty of robbery in the first degree, both counts of armed criminal action, and the lesser-included offense of (felony) murder in the second degree. Petitioner was sentenced to an aggregate of 70 years of imprisonment.[1]

For federal habeas relief, Petitioner raises the following claims: (1) the trial court erred in denying Petitioner's motion to suppress identification evidence; (2) the motion court erred in denying Petitioner's motion for post-conviction relief for ineffective assistance of defense counsel; (3) the trial court erred in denying Petitioner's motion in

---

[1] Petitioner was specifically sentenced to 30 years each for the murder conviction and the robbery conviction, and 35 years for each count of armed criminal action. The murder and robbery convictions were to be served concurrently with their associated armed criminal action counts, but consecutive with respect to each other.

limine to prevent the State from introducing evidence that Petitioner told his girlfriend, Alysha Gregory, that he shot the victim; and (4) the trial court erred in failing to instruct the jury on involuntary manslaughter. For the reasons set forth below, habeas relief will be denied.

## BACKGROUND

### Incident

The State's evidence established the following. On the evening of June 22, 2008, cousins Terrence Mims ("T. Mims"), Trevon McCray, Justin Mims ("J. Mims"), Barry Willis, and Richard Pittman,[2] were playing basketball together at a neighborhood park. While leaving the park, they noticed a group of men, including Petitioner, following them. After catching up with the group of cousins, one of the men robbed T. Mims of a gold chain. One of the men also punched T. Mims, although it is unclear whether this was the same person who stole the gold chain. When T. Mims attempted to run away, he was shot in the head and died as a result.

### Police Investigation

Police arrived on the scene shortly after the shooting. T. Mims was transported to the hospital, and the police detained the witnesses[3] for the homicide detectives. The witnesses gave descriptions of the assailants, and the direction in which they ran after the shooting. Based on the descriptions, Detective Kevin Bentley believed that the assailants

---

[2] All but T. Mims, at the time, were minors.

[3] It is unclear from the initial police report, Resp't Ex. H, at 40, whether these witnesses were the cousins or others.

were members of a gang that included Petitioner.  Detective Bentley believed that the descriptions by the witnesses of one of the assailants closely matched Petitioner, based on Detective Bentley's recollection of a prior police-related contact with Petitioner.  Within hours, the police created a photographic line-up, including a photograph of Petitioner and five other headshots of men with similar height, weight, and hairstyle as Petitioner.

On the same day as the shooting, the police showed the line-up to McCray, Willis, and Pittman, who witnessed the murder, and took their statements.  McCray reported that one of the men punched the victim, and another man shot the victim.  McCray then identified Petitioner as the person who punched the victim.  Willis stated that he ran from the scene after the victim was punched, and was unable to identify Petitioner as having any involvement.  Pittman identified Petitioner as the person who both robbed and shot the victim.

The following day, June 23, 2008, the police initiated a search for Petitioner.  The police found Petitioner at 5752 Lillian Avenue, and after gaining consent from the resident's owner, they conducted a search of the property.  During the search, the officers encountered Petitioner's mother and his girlfriend, Gregory, who both agreed to be interviewed at police headquarters.  During Gregory's interview, she told Detective Wallace Leopold that she did not know anything about the incident.

Later on June 23, 2008, Petitioner was taken into custody and placed in a physical line up with four other prisoners who were similar in appearance to Petitioner.  McCray, J. Mims, Willis, and Pittman were brought in separately for viewing.  According to the police reports, McCray was a "100% positive" that Petitioner was the person who

punched the victim; J. Mims was a "100% positive" that Petitioner was present during the crime, but J. Mims did not identify what action Petitioner had taken; Willis did not identify Petitioner; and Pittman was a "100% positive" that Petitioner had shot the victim. Resp't Ex. H at 45. Petitioner was subsequently placed under arrest.

On the evening of June 24, 2008, Gregory returned to police headquarters on her own and asked to speak with homicide detectives. Gregory reported to Detective Leopold that at some point between the night of June 22 and morning of June 23, Petitioner told her that one of Petitioner's associates had robbed a male victim of a gold neck chain, punched the victim, and gave Petitioner a gun to shoot the victim. Gregory reported that Petitioner told her that he had been forced to shoot the victim, and if he had not, he could have been shot himself. Gregory also reported that Petitioner told her that he aimed for the victim's legs, in order to avoid hurting the victim. When Detective Leopold asked Gregory why she had not provided this information during her first interview with the police, Gregory stated that she was afraid at the time, but had since realized that she needed to do the right thing for the victim.

**Pre-Trial**

In preparation for trial, defense counsel deposed McCray and J. Mims and questioned them about their identification of Petitioner in the police line-ups. During McCray's deposition, McCray stated that he remembered identifying Petitioner as the shooter and the robber. During J. Mims's deposition, J. Mims stated that he remembered identifying Petitioner as the shooter with certainty, at the physical line-up.

Defense counsel filed a motion to suppress any in-court identification and testimony about any out-of-court identifications of Petitioner by the State's witnesses. The motion asserted that the identification evidence would violate Petitioner's constitutional rights for the following reasons: (1) any identification would be the product of an unlawful arrest; (2) the circumstances of any out-of-court identification were inherently suggestive and conducive to mistaken identity; (3) any in-court identification of Petitioner would be tainted by impermissible and suggestive procedures; and (4) there was no adequate independent basis for in-court identifications of Petitioner.

At a pre-trial conference on the motion, held prior to voir dire, defense counsel explained that when she prepared the written motion, she believed that the photographic line-up was tainted because, after reviewing a black-and-white copy of the photographic line-up, she perceived one of the headshots to be female. However, upon receiving the photo spread in color from the State, defense counsel acknowledged that the headshot in question appeared male, but she could not be certain without names of the participants. Defense counsel subsequently requested that the court take the motion along with the case. The trial court agreed and instructed defense counsel that she should approach the bench at the appropriate time to renew her motion.

At the same pre-trial conference, defense counsel moved in limine to prohibit Detective Leopold from testifying about statements that Petitioner's girlfriend, Gregory, reported hearing from Petitioner. Defense counsel argued that such testimony by Leopold would constitute double hearsay. The State responded that it did not intend to elicit such testimony from Detective Leopold. The State explained that it would be

calling Gregory as a State's witness to testify first-hand about what she reported hearing from Petitioner, and would only call Detective Leopold if Gregory denied reporting such statements. The trial court ruled that Gregory would be allowed to testify about statements Petitioner made to her, and if she denied reporting such statements, then the State would be allowed to impeach her testimony by calling Detective Leopold.

**Trial**

During the trial, which commenced on December 7, 2009, McCray, J. Mims, Willis, and Pittman each testified as to the details of the incident and the identity of the shooter. The four witnesses contradicted each other as to who robbed the victim, but McCray, J. Mims, and Pittman identified Petitioner as the shooter. Willis testified that he was not able to identify the shooter.

McCray testified that when the police showed him the photographic line-up, he identified Petitioner as the shooter because of a "sixty-one hundred Sherry" tattoo on Petitioner's neck.[4] Resp't Ex. A at 287. McCray also testified that he identified Petitioner as the shooter in the physical line-up. On cross-examination, when defense counsel asked whether McCray was aware that Petitioner did not have a sixty-one Sherry tattoo on his neck, McCray replied simply "[t]hat's what I saw." *Id*. at 300. When defense counsel questioned McCray about the physical line-up, McCray testified that he identified Petitioner as the shooter and denied identifying Petitioner as only the person who punched the victim.

---

[4]   A review of the record suggests that "sixty-one hundred Sherry" (also referred to as "sixty-one Sherry" and "Six one Sherry AV") refers to a gang-affiliated name and/or symbol.

6

J. Mims testified that when the men approached his cousins and him on the day of the shooting, Petitioner pulled out a gun and demanded the victim's chain. J. Mims further testified that after another man punched the victim, Petitioner was still holding the gun and shot the victim when the victim attempted to run. J. Mims testified that when officers arrived, he described the shooter's general appearance, including braided hair and a tattoo on the right side of his neck. J. Mims testified that he was unable to identify the shooter with certainty at the photographic line-up because he could not see a tattoo. When questioned on cross-examination about the line-ups, J. Mims testified that he was certain that he identified Petitioner as the shooter in the physical line-up.

Pittman testified that Petitioner shot the victim when the group was fleeing after the victim had been punched. Pittman also recalled identifying Petitioner as the shooter in both the photographic line-up and the physical line-up. Pittman stated that he was able to identify Petitioner as the shooter because of Petitioner's hairstyle. On cross-examination, defense counsel attempted to challenge the credibility of Pittman's identification of Petitioner, highlighting that Pittman was only ten years old at the time of the murder, that he admitted he was running away when the shooting occurred, and that he seemingly relied solely on a hairstyle for identification. On redirect examination, Pittman testified that he also relied on Petitioner's neck tattoo to identify Petitioner as the shooter, but he admitted that did not tell the police that fact.

Gregory testified that the morning following the murder, Petitioner talked about the incident with her. Gregory testified that Petitioner told her that there was an incident during which someone was punched, and an associate tossed Petitioner a gun and told

7

Petitioner to shoot. Gregory stated that Petitioner admitted he fired the gun, but claimed that he aimed for the victim's legs, not for his head. On cross-examination, Gregory initially testified that it might have been that Petitioner told her that he was just told to shoot but did not actually shoot the victim. However, when pressed on the subject, Gregory responded by stating that she was "tired of lying" and re-affirmed that Petitioner told her that another man tossed Petitioner a gun and told Petitioner to shoot, that Petitioner shot the gun, and that Petitioner only meant to shoot the victim in the leg. Resp't Ex. A at 357-59. On redirect examination, Gregory also testified that Petitioner had a tattoo on his chest that ran approximately from shoulder to shoulder that said "[s]ix one Sherry AV." *Id.* at 423.

Throughout the trial, defense counsel never approached the bench to renew her motion to suppress in-court identifications or testimony regarding out-of-court identifications of Petitioner. Nor did defense counsel object to the witnesses' testimony about pre-trial identification of Petitioner, or to the witnesses' in-court identifications of Petitioner as the shooter. Defense counsel did object to the admission of the photographic line-up into evidence and the admission of a photograph of the physical line-up into evidence, stating only that the objections were pursuant to her motion, without providing further argument. Both objections were summarily overruled. Petitioner did not testify at trial, but through cross examination sought to establish that he was not present at the scene of the incident and had no involvement in the crime.

At the close of all evidence, Petitioner moved for a judgment of acquittal. The trial court denied the motion, and submitted the charges to the jury. The trial court gave

8

the State's requested instructions on the lesser-included offenses of felony murder and conventional murder in the second degree, but the court denied defense counsel's request for an instruction on voluntary manslaughter. The trial court held such an instruction was not warranted in light of the evidence.

As stated above, the jury returned a verdict finding Petitioner guilty of felony murder in the second degree, robbery in the first degree, and two counts of armed criminal action. Petitioner subsequently moved for acquittal notwithstanding the jury's verdict, or in the alternative a new trial, and the trial court denied the motion.

**Direct Appeal**

Petitioner raised one point on direct appeal. Petitioner argued that the trial court erred in overruling the motion to suppress identification evidence, and allowing the identification evidence at trial, because the pre-trial identification procedures were so suggestive as to create a substantial likelihood of misidentification and render the identifications unreliable. Petitioner claimed the line-ups were unduly suggestive because (1) Petitioner's photograph was placed in the photographic line-up only because police believed he was a gang member and not because police had any other independent or reliable reason to suspect Petitioner of the crime; (2) the witnesses were inconsistent in identifying Petitioner before trial; (3) the witnesses were inconsistent in describing the shooter's tattoo; and (4) none of the witnesses' recollections of the shooter's tattoo matched Petitioner's tattoo.

The Missouri Court of Appeals held that Petitioner did not properly preserve the claim of error because he did not timely object at trial to the in-court identifications or to

9

the testimony about the out-of-court identification procedures, and none of the four grounds relied on in his appeal was ever presented to the trial court. The appellate court also declined to conduct plain error review, stating that there were no extraordinary circumstances in Petitioner's case to justify it.

**State Post-Conviction Proceedings**

In his pro se motion for post-conviction relief, Petitioner asserted numerous claims of trial court error and ineffective assistance of defense counsel. Specifically, Petitioner claimed the trial court erred in (1) denying the motion for acquittal, (2) allowing the hearsay testimony of Gregory, (3) allowing the admission of the photographic line-up, (4) refusing to submit Petitioner's proffered jury instruction, (5) allowing Gregory's testimony on Petitioner's tattoos, and (6) admitting photographs of the victim's body. Additionally, Petitioner claimed defense counsel was ineffective for (7) inadequately conducting discovery, (8) failing to discuss the State's proposed plea offers, (9) failing to adequately object to evidence and arguments presented by the State, (10) not spending enough time with Petitioner, and (11) failing to challenge jury instructions.

In his amended motion for post-conviction relief, filed with the assistance of counsel, Petitioner made only one claim:[5] defense counsel was ineffective in failing to utilize prior inconsistent statements of the eyewitnesses to undermine their identification and credibility. Specifically, Petitioner argued that defense counsel was ineffective for failing to "perfect" the impeachment of McCray and J. Mims. Petitioner alleged that

---

[5] The amended motion did not refer to or incorporate the arguments raised in Petitioner's pro se motion.

reasonably competent counsel in similar circumstances would have secured witnesses and evidence to impeach McCray and J. Mims with their prior inconsistent identifications. Petitioner further alleged that he was prejudiced by defense counsel's failure because the in-court identifications made by McCray and J. Mims were central to the State's case.

A hearing was held on January 20, 2012, at which the motion court heard from defense counsel. Defense counsel testified that she was aware of the inconsistencies in McCray's and J. Mims's statements and that she could have impeached both witnesses by calling the police officers that took the police reports to highlight the inconsistencies. However, defense counsel testified that she chose not to call either police officer because she did not want to give the officers the opportunity to testify that McCray, J. Mims, and Pittman all consistently placed Petitioner at the crime scene in some capacity. She reasoned that if Petitioner was placed at the scene, even if not as the shooter, he could still be liable as an accomplice. Defense counsel testified that she was presented with a choice to either impeach the witnesses through the officers, which would risk corroborating the evidence that placed Petitioner at the scene, or not perfect the impeachment of the witnesses and focus on denying Petitioner's involvement completely.

The motion court found that defense counsel was not ineffective, but instead made a reasonable decision as to trial strategy. The motion court reasoned that there was considerable evidence against Petitioner and that defense counsel made significant attempts to demonstrate problems with the witnesses' identifications of Petitioner. The motion court further reasoned there was no reasonable probability that had defense counsel attempted further impeachment, the result of the trial would have been different.

Therefore, the motion court concluded that Petitioner's right to the effective assistance of counsel was not violated.

In affirming the denial of post-conviction relief, the Missouri Court of Appeals held that it was reasonable for defense counsel to pursue the defense theory that Petitioner was not present at the scene and attempt to prove the witnesses misidentified Petitioner. Similar to the motion court, the appellate court reasoned that calling the police officers to impeach the witnesses' statements would have undermined defense counsel's strategy because the police officers could have corroborated statements that, at a minimum, placed Petitioner at the scene of the crime.

**Federal Habeas Petition**

As noted above, Petitioner raises the following grounds for federal habeas relief: (1) the trial court erred in denying Petitioner's motion to suppress identification evidence; (2) the motion court erred in denying petitioner's motion for post-conviction relief for ineffective assistance of defense counsel; (3) the trial court erred in denying Petitioner's motion in limine to prevent the State from introducing evidence that Petitioner told Gregory that he shot the victim; and (4) the trial court erred in failing to instruct the jury on involuntary manslaughter.

Respondent argues that each of Petitioner's grounds has been procedurally defaulted, and that in any event, each is without merit. Petitioner did not file a traverse.

# DISCUSSION

## Procedurally Defaulted Claims of Trial Court Errors (Grounds One, Three, and Four)

Under the doctrine of procedural default, a federal habeas court is barred from considering the merits of a claim not fairly presented to the state courts, absent a showing by the petitioner of cause for the default and prejudice resulting therefrom, or that he is actually innocent, such that a miscarriage of justice would result by failing to consider the claim. *E.g., Murphy v. King*, 652 F.3d 845, 849 (8th Cir. 2011). The Court agrees with the State that Petitioner's Grounds One, Three, and Four were procedurally defaulted in state court.

Petitioner's habeas claim alleging the trial court erred in denying Petitioner's motion to suppress identification evidence (Ground One) was not properly preserved in trial court. Under Missouri law, "to properly preserve a challenge to identification testimony, a defendant must file a pretrial motion to suppress, object timely at trial, and include the issue in his motion for new trial." *State v. Wendleton*, 936 S.W.2d 120, 123 (Mo. Ct. App. 1996). Furthermore, the issue "is preserved for appellate review only if it is based on the same theory presented at trial." *State v. Johnson*, 207 S.W.3d 24, 43 (Mo. 2006).

The Missouri Court of Appeals correctly held that Petitioner failed to properly preserve the objections to the in-court identifications or the testimony about the out-of-court identification procedures because none of these objections were raised at trial. The Missouri Court of Appeals declined to grant plain-error review, and "[w]here the state

court *declines* to conduct plain error review of a defaulted point, the procedural bar must remain intact." *Johnston v. Bowersox*, 119 F. Supp. 2d 971, 979 (E.D. Mo. 2000), *aff'd sub nom. Johnston v. Luebbers*, 288 F.3d 1048 (8th Cir. 2002).

Petitioner has never asserted, either in state court or in this federal habeas petition, that defense counsel was ineffective for failing to properly preserve any objection to the identifications. Therefore, the exception under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), which excuses the procedural default of an ineffective trial counsel claim based on the ineffective assistance of post-conviction counsel for failing to raise such a claim, does not apply.

Likewise, Grounds Three and Four are defaulted. Petitioner's habeas claims alleging trial errors based on the denial of Petitioner's motion in limine to preclude the State from introducing evidence that Petitioner told Gregory that he shot the victim (Ground Three), and on the failure of the trial court to instruct the jury on involuntary manslaughter (Ground Four), each could and should have been raised on direct appeal, and the failure to do so constituted a procedural default. Furthermore, the ineffective assistance of direct appeal counsel cannot serve as cause to excuse the default, because such a claim of ineffective assistance was not raised in the state post-conviction proceedings. *See Taylor v. Bowersox*, 329 F.3d 963, 971 (8th Cir. 2003); *Bland v. Pash*, No. 15-0041-CV-W-GAF-P, 2015 WL 3542816, at *3 (W.D. Mo. June 4, 2015); *see also Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (declining to extend the holding of *Martinez,* that ineffective assistance of post-conviction counsel could constitute cause to

excuse a procedural default of a claim that trial counsel was ineffective, to a claim that direct appeal counsel was ineffective).

Petitioner raises no cause for or prejudice resulting from the procedural default of Grounds One, Three, and Four, and Petitioner has failed to show that a miscarriage of justice will result if his defaulted claims are not considered. *See Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2006) (holding that a petitioner must present new evidence that affirmatively demonstrates that he is actually innocent of the crime for which he was convicted in order to fit within the miscarriage of justice exception). But in any event, each of these claims is without merit.

Regarding Ground One, the admission of identification evidence will implicate due process for the purpose of a federal habeas claim only when the identification procedure was "both impermissibly suggestive *and* unreliable." *See Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 797 (8th Cir. 2013) (citation omitted). "When there are no differences in appearance tending to isolate the accused's photograph, the identification procedure is not unnecessarily suggestive." *Schawitsch v. Burt*, 491 F.3d 798, 802 (8th Cir. 2007). To determine whether the identification procedure was unreliable, courts consider "1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation." *Id.*

Petitioner does not suggest, nor does the record reveal, that there were any differences in appearance tending to isolate Petitioner in the line-ups. Therefore, the

15

identification procedures here were not impermissibly suggestive.  Moreover, the record shows that Petitioner's photograph was included in the initial line-up based on physical descriptions taken from witnesses immediately after the incident; the witnesses made the identifications the same day as the incident; and at least one of the witnesses, Pittman, remained consistent in the identification of Petitioner.  Thus, under the totality of circumstances, the Court cannot say that the identifications were so unreliable as to constitute a violation of due process.  *See, e.g.*, *Clark v. Caspari*, 274 F.3d 507, 511–12 (8th Cir. 2001) (holding that identifications made at police showup were sufficiently reliable, notwithstanding inconsistencies in the witnesses' identifications, where the witnesses had an opportunity to clearly view the perpetrators, and made the identifications the same day, while their recollections were fresh).  Petitioner's Ground One will be denied.

Regarding Ground Three, it is not within a federal habeas court's province "to reexamine state-court determinations on state-law questions," such as evidentiary rulings regarding hearsay.  *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.*  Only when the "evidentiary ruling infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process" will the ruling justify habeas corpus relief.  *Abdi*, 450 F.3d at 338 (citation omitted).

The trial court's evidentiary ruling to admit Gregory's testimony about Petitioner's admissions to her regarding his involvement in the crime did not infringe upon any

16

constitutional protection and was not so egregious as to amount to a denial of due process. In fact, the ruling was consistent with the state rules of evidence. *See State v. Stokes*, 492 S.W.3d 622, 625 (Mo. Ct. App. 2016) (holding that "the admission of a party opponent is not hearsay . . . if it is relevant and material to the case and is offered by the opposing party"). Petitioner's Ground Three must be denied.

Petitioner's Ground Four is also without merit. As an initial matter, Petitioner never requested an involuntary manslaughter instruction, only voluntary manslaughter. In any event, the trial court's failure to give an involuntary manslaughter instruction did not deprive Petitioner of a fair trial. The Eighth Circuit "has consistently held that the failure to give a lesser included offense instruction in a noncapital case rarely, if ever, presents a constitutional question." *Dickerson v. Dormire,* 2 F. App'x 695, 695 (8th Cir.2001).

> In order to grant federal habeas relief, a court would have to say that the state courts' action was contrary to, or an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). The Supreme Court has never held that due process requires the giving of lesser-included-offense instructions in noncapital cases.

*Randell v. Norman*, No. 4:12 CV 1020 AGF, 2015 WL 1456977, at *4 (E.D. Mo. Mar. 30, 2015), *appeal dismissed* (Oct. 8, 2015) (citing *Dickerson* 2 F. App'x at 696). Thus, Petitioner's Ground Four must be denied.

**Ineffective Assistance of Defense Counsel Claim (Ground Two)**

Petitioner's Ground Two asserts ineffective assistance of defense counsel, but does not specifically state facts on which the court could determine its merits. While pro

17

se habeas corpus petitions should be liberally construed to prevent injustice, federal courts are not required to sift through the entire state court record to ascertain whether facts exist which support relief. *Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990) (finding that a habeas corpus petition that referenced the entire record for supporting evidence was insufficient to warrant review). In light of Petitioner's specific reference to the motion court's denial of his post-conviction motion as his support for Ground Two, the Court will construe the ineffective assistance of defense counsel claim to be the same claim raised in Petitioner's amended post-conviction motion presented in the state court. As stated above, Petitioner argues that defense counsel's failure to perfect impeachment of McCray and J. Mims was so unreasonable that it violated his Sixth Amendment rights.

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to show ineffective assistance of counsel, "a [petitioner] must show that counsel's performance was deficient," and "that the deficient performance prejudiced [his] defense." *Id.* at 687. Furthermore, when "[c]onsidering an attorney's performance, [the court] must indulge a strong presumption that the conduct was reasonable, and the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Paulson v. Newton Corr. Facility*, 773 F.3d 901, 904 (8th Cir. 2014) (citation omitted).

In order to show prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Merely showing a conceivable effect is not enough; a

18

reasonable probability is one sufficient to undermine confidence in the outcome." *Id.* (citations omitted). And when addressing claims that were addressed by state courts, "[t]aken together, AEDPA and *Strickland* establish a doubly deferential standard of review." *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (citation omitted).

Here, the state courts reasonably held that defense counsel's failure to perfect impeachment of McCray and J. Mims did not constitute ineffective assistance of counsel. Defense counsel testified that she was well aware of the inconsistencies between McCray's and J. Mims's statements in court and their prior statements, but she reasoned that calling the necessary law enforcement officers to further impeach the witnesses' testimony would undermine her trial strategy.

"Generally, trial strategy and tactics are not cognizable in a federal habeas corpus proceeding." *Mills v. Armontrout*, 926 F.2d 773, 774 (8th Cir. 1991) (citation omitted); *Bowman v. Russell*, 2015 WL 687179, at *9 (E.D. Mo. Feb. 18, 2015). Defense counsel's strategy was to argue that Petitioner was not present at the crime scene, and the law enforcement officers could have provided additional testimony that would have corroborated allegations of Petitioner's presence at the scene in some capacity. Defense counsel instead attempted to show the witnesses misidentified Petitioner, in order to support the theory that he was not at the scene at all. Even if defense counsel had impeached the inconsistent statements about Petitioner's identity as the shooter, both statements would have been consistent in placing Petitioner at the scene. Consequently, as defense counsel noted, Petitioner could have been subjected to the same criminal punishments under accomplice liability. *See* Mo. Rev. Stat. § 562.041.

In light of these facts and the other evidence at trial, the state courts reasonably found that the trial strategy was reasonable and that the outcome of the trial would not have been different had defense counsel attempted to further impeach the testimony of McCray and J. Mims. Accordingly, Ground Two is without merit.

## **CONCLUSION**

The Court concludes that Petitioner is not entitled to federal habeas relief. The Court does not believe that reasonable jurists might find the Court's assessment of the procedural or substantive issues presented in this case debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. § 2254(d)(2). *See Buck v. Davis*, 137 S. Ct. 759, 773 (standard for issuing a Certificate of Appealability) (citing *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003)).

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Marquise Atkins for a writ of habeas corpus relief is **DENIED**. ECF No. 1.

**IT IS FURTHER ORDERED** that a certificate of appealability shall not be issued.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 8th day of August, 2017.